The morning docket is the League of Wilderness Defenders v. Forest Service  D.R. Johnson Lumber Company, a dramatic change in topic here, talking about trees and fires and NEPA. Appellate's position here, Your Honor, is that the Forest Service took a hard look at the environmental effects of the Crane Prairie Salvage Project on the soils and wildlife as required by NEPA. The Forest Service addressed this so-called BESHTA report point by point in the EA appendix, but the key here is that the maintenance and restoration of environmental assessment. The Supreme Court in Metropolitan Edison v. People Against Nuclear Energy emphasized that NEPA is about looking at environmental effects. And in this case, when you look at the EA, what the EA discloses is the effects on the wildlife, on the soil compaction and the soil productivity, which is what it is required to do. The Forest Service took a hard look at not harvesting the timber, as advocated by BESHTA, through a no-action alternative in the EA. Second, the Forest Service considered a restoration-only alternative, which is, well, we'll leave the trees there uncut, but we would like to just plant trees underneath the dead trees. Now, the Forest Service didn't fully develop the restoration-only alternative based on the agency's firsthand experience on the fire-prone Bend-Fort Rock Ranger District. They learned that the dead, overstory trees eventually fall and increase the fire hazard and risk that the re-burn will destroy the trees they plant. And that actually occurred in the jack, in the box, in the pline of fires. Third, the Forest Service designed the sale to stay off the sensitive sites, as BESHTA had recommended. No harvest is occurring in roadless areas, frost pockets, steep slopes, medium or highly erosive soils. And that's in the EA, in the administrative record, excuse me, in the excerpt of record at page 81. Soil productivity was addressed. Over 10 to 20 tons of organic matter will be retained on the site, EDR 80. The treetops will be retained in areas where the fire burned to allow organic matter to replenish the soil. Soil compaction was addressed in the EA. There were maps of the soil types and they divided the soil types into four categories based on their condition classes of compaction and disturbance. And the EA discusses the experience from past burns and salvage logging and concludes that, quoting, on the Deschutes National Forest, soil monitoring has shown that the majority of detrimental soil disturbance occurring in the burned areas occurs during the salvage operation, which is what BESHTA's point was, rather than during the burn itself. Counsel, there have been two recent cases from this Court that were post-briefing. But I wonder if you're familiar with them, and if you are, what effect they have on your district court did. One of those is Center for Biological Diversity versus the Forest Service, and the other is Friends of Yosemite Valley versus Norton. And I should just kind of preview up front that it seems to me that those cases suggest that the district court here did what it should have done in the face of the question, the scientific questions that were raised about the conclusion. And it's hard because, you know, you've got NEPA law, which doesn't help you in terms of the statute much because it doesn't say a lot. You have the regulations, which are quite voluminous and you have to pick through those. And I think taking the Center for Biological Diversity case, which I am familiar with, I'm also familiar with the Wild and Scenic Rivers case, I think here that the issue is, the judge was saying, well, you know, BESHTA had some concerns about what fire salvage would do. Now, he didn't make the comments like the Center for Biological Diversity where the Arizona Fish and Game had made the comments. But you can view these comments, I think, in the context of the NEPA law either one of two ways. First, you can view it as a responsible opposing view, which is at 40 CFR 1502.9, which is what the Center for Biological Diversity case assesses. Or second, you can view it as the case in Blue Mountain Biodiversity Project involving the tower fire salvage that this court decided as an issue of the degree over whether the effects are going to be highly controversial. And I'd like to go down both those tracks and say whether the district court was either analyzing it under one or the other, it was wrong in either case. First, in terms of responsible opposing views, it says that the agency shall discuss in the final statement, in the final statement, not the draft statement, in the final statement, responsible opposing views which were not discussed in the draft statement. And the significance of the Center for Biological Diversity case is that that involved an environmental impact statement. This involves an EA. The section 1502.9 about discussing responsible opposing views applies to EISs, not EAs. This court in Akiak Native Community versus U.S. Postal Service emphasized that NEPA does not require that EAs include a discussion of mitigation strategies, quote, this provision of the regulations governs the preparation of an EIS, not an environmental assessment. This distinction is critical. And so we would argue it's almost as if it wasn't in, available at the time of public comment. The comment is made, the Forest Service decides we're going to address that and we're going to address it in an appendix. Our position is an appendix is part of the EA. In Center for Biological Diversity, they redacted the report. You couldn't see it. It was not there. In our case, what the Forest Service did is they thoughtfully went through point by point by point what BESHTA had raised about the soils issues in the appendix. And so... You're talking about Appendix G, right? Yes. Is it your position that Appendix G is explicitly referred to in the text of the EA or simply that the topic areas are covered? I am saying that Appendix G, or I can see that Appendix G is not explicitly referred to in the EA. I guess was the point that I was getting at. Does that make any difference to your argument as to... I don't think it does because when you look at the decision notice that accompanied the EA, the decision notice explicitly references Appendix G. It explicitly references the BESHTA report and it says this was an issue that was raised and you can refer to Appendix G for the discussion regarding harvesting and not harvesting after a fire. And so the fact that you have an EIS that throughout the EIS doesn't necessarily, or an EA for that matter, mention each of maybe ten of its appendices in the body, that doesn't prohibit the reader or the Forest Service from relying on that appendices in support of its decision. What's the ER number for the decision notice, please? Your Honor, I'll get that after the break. You can do it after. Yeah, after the rebuttal. But so in any event, the Center for Biological Diversity case also was, the Forest Service was saying, look, we have this response in the record from the Arizona Fish and Game. And the court was saying in the record isn't good enough. It needs to be in the EIS. We've cited cases in the briefs that say an appendix is part of the EA. And in this case, unlike the Blue Mountain Biodiversity case where there was a 3,000-page administrative record and they were trying to find where that was, here we believe it was there. Now on the second element where the court in the Blue Mountain Biodiversity case tried to assess the importance of BESHTA was under 1508.27.4 where they discuss the ten factors of significance and the degree to which the effects on the environment are likely to be highly controversial. And here we believe that's inapplicable and the district court erred because the Forest Service agreed with BESHTA that there would be detrimental soil disturbance in this case in the form of soil compaction. And it's one of degree, of course. I think if, you know, BESHTA says if you're going to log on very steep slopes right near the streams above threatened endangered fish like they were doing in Blue Mountain Biodiversity, that's very significant. In this case, you're in an area where you're a mile and a half from water. There is no threatened endangered species. There's no riparian bovers because there's no water there. There's no soil to get into the water. The compaction is the issue and the Forest Service looked at mitigating that through the use of skid trails and through the use of seasonal restrictions on logging and through the use of ripping the soil after they were done because of the gentle slopes to stop the compaction. In addition, the Blue Mountain Biodiversity case and the court here apparently was concerned that the BESHTA report represented something regarding the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risk, which is another one of the ten factors of significance that would trigger an EIS under 1508.27. But as the EA explains, on the Deschutes National Forest, soil compaction is not unique and is a known and managed risk. And so we don't believe that that trigger either requires an EIS. ER 78 and 79 contains a map and table and a description of the soil conditions. We have excerpts of the record of the Forest Plan that said one of the things on the Deschutes National Forest, unique to Central Oregon where there isn't a lot of water, is that in harvesting timber compaction is a concern. So there's nothing unique in this particular area. And the Forest Service already addressed generally the issue of compaction in the Forest Plan EIS and adopted measures you'll see in the excerpts of record for dealing with compaction. And the way and the measure that the Forest Plan recommended and the EA adopted, which was tiered to the Forest Plan, excuse me, was that they would use some of these measures to restrict the logging. They would monitor after the logging was done to see what the degree of disturbance was. And then they would take actions to remedy that disturbance to bring it, if need be, in conformance with the standards. And in fact, if you look at the ER page 63, in the EA it says, it has a table and the Forest Service estimates it will need to conduct about 56 acres of subsoiling after the harvest to restore the compacted timber. So in any event, and we think that approach is consistent with this Court's Okanagan Highlands case where it says, you know, you don't know exactly, you disclose what the effects are going to be. You're not exactly sure what might happen, but you're going to use monitoring as a tool to resolve the problems as they arise. And we think that's consistent with NEPA and the Court's decisions. Okay. I'll save the balance for rebuttal. May it please the Court. My name is Susan Jane Brown. I'm representing the League of Wilderness Defenders in this case. I'd like to first begin by noting that this case is the latest case to come before the Ninth Circuit and the District Courts of the Circuit regarding post-fire salvage logging. And the problem seems to be that the Forest Service still cannot figure out what the law requires, despite this Court's and the District Courts of the Circuit, their very explicit interpretations of what the National Environmental Policy Act requires for the agency to do in terms of environmental analysis and addressing scientific controversy surrounding post-fire salvage logging. In this case, the Forest Service has failed to comply with those regulations for at least four reasons. First, the Forest Service has failed to disclose and analyze the environmental effects of post-fire salvage logging as NEPA requires. NEPA is very clear that it requires disclosure of information, including scientific controversy, not only so that the decision maker can make an informed decision, but also so that the public may be involved in that project and to challenge the agency's decision if it so chooses. Is it your contention that Appendix G was not sufficiently disclosed or that it was not sufficiently analyzed? That is correct. Which is it? That was an either-or. Oh, that was an either-or? I guess your answer sounds like both. It does sound like both. I understand, I think, your argument about why it wasn't adequately analyzed, but I have some difficulty with why it wasn't adequately disclosed. If you look in the administrative record, and actually, opposing counsel was looking for the record site for the decision notice, and so I would point your attention to ER 291 for the decision. That's the decision notice? Yes. That's the decision notice. Thank you. And then for the environmental assessment, let's see, that is... Yep, 46 is correct. That's where it starts. And I would point out why Appendix G was not sufficiently disclosed to the public is because it only appears in one place in the EA, and that's a reference to it on ER 94. And so it references Appendix G, and it says it's the last thing that appears in the EA, and it says that it refers to Appendix G as public scoping. And so one who would want to think about what happened in the public scoping process would go to Appendix G. But one who... Excuse me, public what? Public scoping, which is where the... All right, thanks. Okay. But if one wanted to find out about the scientific controversy surrounding post-fire salvage logging... You wouldn't know to look it. You wouldn't go there. And that disclosure, which this Court has held several times, must be in the body of the text, whether it's an EA or an EIS, is irrelevant in this case. The disclosure of the scientific controversy must be... It's not the fact that it's in an appendix. If the EA had said in giant mold letters, if you're interested in understanding the scientific controversy, please see Appendix G, which is attached, you wouldn't have this argument. I think we still would have this argument because this Court's holding in Center for Biological Diversity, as well as the Blackwood case, very clearly says that disclosure and discussion of the scientific controversy must be in the text of the environmental document. Well, that would have done the disclosure piece, I guess. Right. And the analysis. In my example, would that suffice for disclosure as distinct from analysis? It would suffice for disclosure, but the analysis also needs the other half of NEPA. I think I understand your argument. Okay. And then our other concern regarding Appendix G in particular is that the EA on page, on ER 94, refers you to an Appendix G that doesn't seem to be the same Appendix G, that once you get to that appendix, those two documents don't seem to be the same thing. And we have several examples for why that is. And Appendix G is found at ER 215. So if you want to take a look at that. The first thing to note about this Appendix G is that the EA says that it should be paginated with G-1, G-2, et cetera. This appendix is only paginated with Roman numerals. So something's missing there. The EA also tells you that a list of people who participated in the public scoping process, a list of those organizations and people should be found in this appendix. And there's no such listing. If you go to the appendix, you also note that it is undated, which is unusual for appendices. Usually there are reports that have been prepared in preparation for preparing the EA. So there's a date, you know, two months before the EA came out, a month before, whatever. This particular document is undated altogether, which, again, if we're talking about whether or not the public had access to this information during the public comment process, when this document was available and prepared is a major issue in this case. And so I would point the Court to those factors. If I can kind of get your thread now. Counsel was arguing no problem, compaction is discussed over here in the EA, and then we have the Report G that we're talking about here, Exhibit G. So they're sort of parallel courses, but they don't meet the law because they didn't merge in the analysis and disclosure process. Is that it? That's part of it. One of the main themes that opposing counsel was working on was the mitigation measure issue. And because we are talking about an area that is pretty dry, we're not talking about spotted owls, we're not talking about aquatic concerns like we were in the Blackwood case. What we're talking about here is soil compaction issues. And so that is separate than the scientific controversy surrounding the Beshter Report. Because in doing an EA, the Forest Service has an obligation to demonstrate that the impacts do not rise to a level of significance that require an EIS. And it can do that by imposing mitigation measures that are applicable to the project at issue, as well as effective and will be implemented. So then the question is, did the Forest Service in this case propose mitigation measures that are adequate for the project at issue? And it is a police position that, no, they did not. And we have that position for several reasons. First of all, there's only a listing of mitigation measures in the EA. And this Court has held several times that a mere listing of mitigation measures is insufficient to qualify as the reason discussion required by NEPA. This sounds like a garden variety NEPA case, except for attachment not referenced and no analysis. Because we go through NEPA all the time. Do we need an EIS? And so that's the ultimate issue. But we're now deciding, did you do enough that we can even analyze whether you need an EIS? Because they never discussed it. They didn't address. And until they do that, we don't get to the second issue, what you've discussed and what you proposed as mitigation doesn't require or does require an EIS. Right, because that's going the right direction, yes. The mitigation measures are so unclear. Step one versus step two. What you did with regard to the report, the way you incorporated and discussed it isn't enough, therefore you need an EIS. Here you're saying we didn't get there because you never even got to first step one. Right. You don't even find that there's an appendix out there that there's a controversy. I'm with you now. Okay. All right, good. Because there's a lot of stuff here. There is a lot of stuff here. And there are a lot of problems with the environmental assessment for the Crane Prairie Project. I understand that, but it seems to me, and see if you can help me here. You didn't like that. Apparently not. Okay. I have a dog who whines like this. So do I. As Judge Graber is saying, if they would have done something to incorporate appropriately under the law, the BESTA report, and had done the analysis, then we'd be discussing whether they did the analysis correct and whether or not we still require an EIS. We don't even get there. Right. From what I can tell, because what we're deciding now is if you're right, they didn't do it and they didn't even do an analysis, we've got to go back, do that, and then we'd get to the EIS. Right. And, again, that's kind of where we're going, yes. Because, again, this Court has held in the Blackwood case that merely not discussing the BESTA report is not sufficient to qualify as requiring an EIS. And so plaintiffs have raised several other issues regarding significance and regarding the environmental effects that would add to the fact that the agency didn't disclose and analyze the BESTA report and other scientific evidence against it. Well, you've been here many times before, and it's always that break point. Yes. Because in some cases we find that we have to send it back so that they do the work. Right. The ultimate issue. In other cases we say, well, they did discuss it, and then we go on to the EIS issue. Right. We're at step one in this case, I think. Yes, we are. So turning to, again, the mitigation measures, which was a main theme of opposing counsel, I already talked about how this Court has held in the past that a mere listing of mitigation measures is not sufficient. And if you look at the EIS, or, excuse me, the EA, that's what we have here in this case, is a listing of mitigation measures. You also have a situation where the mitigation measures have not been assessed in terms of their effectiveness and whether or not they're actually applicable to the situation we have here. Counsel talked about subsoiling. It's unclear whether or not subsoiling is sufficient for salvage sales. We're talking about an environment that is much different than an unburned, green, live forest. We're talking about a fire that has had, in some cases, some pretty devastating effects on the land, including effects to the soil. Aren't you getting into step two now? In other words, you're arguing the merits of if they would have analyzed it and if they would have looked at the best report, that what their conclusion was was not sufficient or improper or did not satisfy NEPA. Am I right there? Correct. Because I want to cover all of my bases. I'm talking here about – and I understand where you're going. Okay. It's all coming back to me. If we're talking about NEPA analysis requiring an EPA, EIS. Correct. We seem to be talking about working on the prophylactic area where you didn't put this on. And the only exception would be – your argument may be as well, no harm, no foul, because it's there. Right. And they parallel work, but they all discuss it. So we're in that area now, aren't we? Right. Because I think counsel's issue – or their position is that it's okay, we've got this appendix that kind of talks about it, and anyway we have these mitigation measures that are sufficient to address the soil concerns identified in the best year report. I take it your position might be, and I'll let you clarify, that whenever you attach one of these scientific controversial reports, you can't dismiss them as saying, oh, well, it's same old stuff. Right. In other words, you've got to somehow deal with them directly and analyze them. Correct. Regardless of what they are. Correct. Okay. And it is possible – it would be theoretically possible to disclose the controversy, say, you know, there's this big hubbub out there about post-fire salvage logging. We understand that. Here's why we think it's not applicable to this particular project. Either we've proposed a bunch of mitigation measures that are applicable to the situation at hand. We don't think we're going to have the type of impacts that the best year report warned against. Therefore, we're going to go ahead and salvage anyway. Or they could say there's scientific evidence on the other side and we find it more persuasive to cause A, B, and C. Exactly. They don't have to agree to that either. Exactly. Correct. So you might not ultimately prevail, but. Correct. And that's, again, all NEPA requires is a particular process, and that's what plaintiffs have always raised is that we may lose in the end, but the point is a certain process of analysis is required in order for the agency to move forward with a project on an EA basis. So that's kind of where we're going with that. Let me see here. I want to make sure that I get all of my issues regarding the appendix. I think in some of the briefing, D.R. Johnson argued that the appendix was accessible to the public during the comment process, and therefore it should, appellees should have addressed those issues earlier. But, again, I would note that this document is undated. We're not sure when it came about. We only, plaintiffs only obtained it through FOIA after the decision came out. And this file code that's in the upper left-hand corner, it references 36 CFR 215.6 D&E, and that is a regulatory section that deals with how the agency documents its response to comments. We would only get there if we found that it was properly included so that we could consider it. Correct. So I'm going to move off that issue now. I just want to make sure. Yes, yes, you're correct. The big word is process. The big word is process. And, again, I would direct the Court's attention back to that very process issue, that NEPA requires disclosure and analysis that we don't think was present in the environmental assessment. And, again, this isn't a situation with a battle of the experts type of situation. We're definitely not to that stage. All we're to the stage of is disclosing controversy and opposition to the Forest Service's proposed action based on a scientific level. Opposing counsel also did raise an issue regarding whether or not an environmental assessment, whether the process required for an EIS is the same as what's required for an EA. In this Court's decision, Kern v. BLM, this Court has held that essentially NEPA's procedures and requirements are the same for an EA and an EIS. So I don't really think that that's an issue here. Second, I'd also like to remind the Court, and it was present in our briefing for sure, that the Forest Service failed to comply with NEPA's requirement to assess the direct, indirect and cumulative effects of its actions, which did not take place anywhere in the EA or even, for that matter, an appendix to the EA, specifically the Charlie Brown Project, fire suppression, fire rehabilitation. Again, step two, right? Yes. Okay. And then finally, because appellees have raised significant questions about the environmental effects of the proposed action, we do believe that the law requires that an EIS should have been prepared in this case. Counsel. Thank you. Mr. Herndon, you have some time left for rebuttal. Thank you, Your Honor. I think we are at step two. I think we can't elevate form over substance here. We need to look at the EA as a whole, including its appendix, and can't just put a blinder on and not consider that in assessing what ultimately NEPA requires is the question, does the EA itself analyze the significance of the environmental effects here? It would almost be like nobody mentioned BESTA until afterwards, and then it came up. And the question is, well, is it – there's another part of NEPA that says, is this significant new information bearing on the environmental effects and its concerns such that you've got to supplement and recirculate? And our position is, when you look at the analysis that the Forest Service did, that the mitigation measures they are going to use is not going to cause a significant effect here. Are you trying to say that the BESTA report has been there, done that, got the T-shirt, it's always on every report, and we always address this issue? No, no, I'm not. So if BESTA report goes to this project, these concerns on this topography and this forest, somehow you have to meet that. It becomes a scientific controversy. Well, it doesn't go to this project, and it's a generic report, and the plaintiffs in their comments on the EA did – yeah. So anyway, I'm out of time. I appreciate the opportunity this morning, but we believe that the district court should be reversed here and would encourage you to look at the decision notice and the EA's discussion and believe it satisfies the disclosure requirements of NEPA. Thank you. Thank you, counsel. Thank you. We appreciate the arguments from all parties. The case just argued is submitted, and we stand adjourned for the morning calendar. All rise. This court for this session stands adjourned.
judges: Brunetti, Tg Nelson, Graber